IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| VERONICA FINLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 21-0101-WS-MU |
| | ) |
| OTIS ELEVATOR COMPANY, | ) |
| | ) |
| Defendant. | ) |

# ORDER

This matter is before the Court on a trio of motions: (1) the defendant's motion to exclude the opinions of the plaintiff's expert witness ("Olson"), (Doc. 30); (2) the defendant's motion for summary judgment, (Doc. 31); and the plaintiff's motion for partial summary judgment. (Doc. 33). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 30-33, 37-39, 42-44), and the motions are ripe for resolution. After careful consideration, the Court concludes the defendant's motions are due to be granted and the plaintiff's motion denied as moot.

# BACKGROUND

According to the complaint, (Doc. 1-2 at 3-23), the plaintiff was a guest at the Wind Creek Casino and Hotel on the night of June 4, 2018. She and her husband entered an elevator on the eleventh floor, headed for the hotel restaurant. The elevator malfunctioned, causing the plaintiff to fall and suffer serious and permanent injury. The complaint as pleaded is more expansive, but by the time the instant motions were filed, the only remaining defendant was Otis Elevator Company, and the only remaining claims were for negligence and/or wantonness and for violations of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). In response to the defendant's motion for summary judgment, the plaintiff has consented to the dismissal of the AEMLD claim

and of all aspects of the negligence/wantonness claim other than negligent inspection and maintenance of the elevator and its supporting structures. (Doc. 38 at 4).

As to these remaining claims, the defendant raises three arguments on motion for summary judgment. First, that the plaintiff cannot prove that the defendant's allegedly negligent inspection and maintenance caused her injuries because Olson's opinions to that effect should be excluded. Second, that the plaintiff cannot prove causation given the evidence of other causes, in particular, a power outage. Third, that there is no evidence the defendant was aware of the problem identified by Olson. (Doc. 31 at 2-3).

The plaintiff's motion for partial summary judgment is directed towards two affirmative defenses advanced by the defendant, both of which address the defendant's assertion that the plaintiff was injured due to a power outage that interrupted power to the elevator. (Doc. 33 at 1).

## DISCUSSION

Because the defendant's motion for summary judgment depends heavily on its motion to exclude, the Court begins its analysis with the latter motion. The motion to exclude is filed pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). "Under *Daubert* and its progeny, we conduct a three-part inquiry to determine the admissibility of expert testimony …." *Tampa Bay Water v. HDR Engineering, Inc.*, 731 F.3d 1171, 1183 (11th Cir. 2013). "Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (quoted in *Tampa Bay Water*, 731 F.3d at 1183). The burden of establishing these three requisites lies with the proponent. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). "[E]ven the admission of expert testimony

that satisfies *Daubert* lies at the sound discretion of the district court." *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1294 (11th Cir. 2022).[1]

The defendant challenges neither Olson's qualifications nor the helpfulness to the jury of his opinions but instead focuses on the reliability of Olson's methodology. Expert testimony "must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning more than subjective belief or unsupported assumptions." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004). Rule 702 identifies three components of the reliability element: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Daubert* identifies several non-exclusive factors that a court may consider as appropriate in gauging the reliability of the principles and methods utilized by the expert: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known and potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Knepfle*, 48 F.4th at 1294 (internal quotes omitted). "Notably, ... these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Among such factors, "[i]n evaluating the reliability of an expert's method, ... a district court may properly

---

[1] Whether to conduct an evidentiary hearing is a decision committed to the Court's sound discretion. *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005). "As we have explained previously, *Daubert* hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses." *Id*. (internal quotes omitted). For example, "[a] district court should conduct a *Daubert* inquiry when the opposing party's motion for a hearing is supported by conflicting medical literature and expert testimony." *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001). Neither side has requested a hearing, and the motion is sufficiently simple that a hearing would be of no assistance. Accordingly, the Court exercises its discretion against conducting such a hearing. The defendant's request for oral argument, (Doc. 30 at 1), construed as a motion for such relief, is **denied**. Civil Local Rule 7(h).

consider whether the expert's methodology has been contrived to reach a particular result." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005).

Whatever factors are considered, the Court's focus should "be solely on principles and methodology, not the conclusions they generate." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (internal quotes omitted). It is therefore error to conflate admissibility with credibility, as by considering the relative weight of competing experts and their opinions. *Quiet Technology*, 326 F.3d at 1341. Thus, for example, "a district court may not exclude an expert because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness." *Rink*, 400 F.3d at 1293 n.7.

The parties agree that, at approximately 11:30 p.m. on June 4, 2018, the plaintiff and her husband entered the #2 passenger elevator and pushed the first floor button. Based on the video retrieved from the closed circuit camera inside the car, (Doc. 30-6), the parties agree that the elevator experienced a sudden deceleration ten or eleven seconds after the elevator doors closed, at which point the plaintiff is seen fallen on the floor. The parties agree that the elevator then continued its downward travel at a reduced speed, its doors opening at the lobby level approximately one minute and forty seconds after they closed on the eleventh floor.

From these threads and others, the parties stitch together their respective narratives. The defendant points to a planned power outage conducted by the property owner without the defendant's knowledge. Evidence supporting this theory includes: (1) documents and testimony indicating that such a power outage was planned for the night of June 4, 2018; and (2) the consistency of a power outage with: (a) the occurrence of a sudden deceleration and stoppage; (b) the simultaneous loss of lighting in the car, as shown on the video; (c) the resumed downward travel of the car, as the emergency generator would have kicked in after approximately three seconds; (d) the reduced speed of the elevator, consistent with the programmed recovery mode triggered by a loss of power; and (e) a contemporaneous loss of power in the #1 and #3 elevators, evidenced by changes in the lobby elevator lights as captured by a lobby video as the plaintiff exited

4

the #2 elevator.  (Doc. 30-5 at 2-3; Doc. 30-6; Doc. 31 at 7; Doc. 31-4 at 3; Doc. 31-5 at 8; Doc. 31-9 at 5-6; Doc. 31-11 at 2; Doc. 39-1 at 3).

The plaintiff denies that a power outage caused the rapid deceleration that caused her fall and injuries.  Her single theory of causation, for which she relies exclusively on Olson, is that one of the #2 elevator's two safeties malfunctioned, causing the elevator to rapidly decelerate without stopping.  The defendant was under contract to maintain the passenger elevators, (Doc. 31-2), and Olson opines that the defendant did so negligently, thereby allowing the malfunction to occur and injure the plaintiff.

The elevator runs along two guiderails.  Under the car are two safeties, one for each guiderail.  These are wedge-style safeties, meaning they operate by driving a wedge between the elevator cab and the guiderail, which physically prevents the elevator from descending.  (Doc. 30-9 at 1).  When an overspeed is detected, the governor initiates the safeties, which grab the rails.  (Doc. 30-7 at 2).  Once the safeties have engaged, they can only be disengaged or released, permitting further downward travel, by lifting the car.  (Doc. 30-9 at 1).

It is possible for a safety to "drag," or rub against a guiderail, without becoming engaged.  The defendant's standard work procedures call for maintenance to include "[e]nsur[ing] wedges and roller cage are free, not in bind or dragging."  (Doc. 38-2 at 2).  The defendant acknowledges that dragging can or does result in metal-on-metal noise.  (Docs. 30-4 at 3; Doc. 30-5 at 3; Doc. 30-9 at 1; Doc. 42-4 at 2).  A properly functioning jury could find from the defendant's service records that complaints of noise regarding the #2 elevator, registered in June and December 2015 and in June, July, and September 2017, were prompted by dragging safeties, with the defendant responding to each complaint by adjusting the safeties.  (Doc. 31-16 at 1-5).

The defendant's witnesses cited above say that, while dragging creates a metal-on-metal noise, it does not slow the elevator.  Olson, in contrast, opines that dragging slows an elevator's descent and that, in this case, dragging by one safety (not both) caused the car to experience "rapid deceleration" without stopping its downward movement (as would occur with either a power outage or an engagement of the safeties).  (Doc. 30-7 at

5

5; Doc. 42-1 at 3-4). The question is whether Olson's opinion is the product of a sufficiently reliable methodology, reliably applied, to satisfy Rule 702 and *Daubert*.

As the plaintiff notes, safeties have been utilized to stop uncontrolled descents since 1854, and "[a]ny modern elevator is equipped with safeties." (Doc. 38 at 5). Despite millions of safety-equipped elevators around the world making countless billions of trips over the course of many decades, Olson identifies not a single instance of dragging ever actually causing an elevator to slow down, much less to suddenly and dramatically decelerate. (Doc. 30-7 at 7). He identifies no literature indicating that a safety dragging or rubbing on a guide rail would slow the elevator. (*Id*. at 8-9). He performed no tests to see if, or under what circumstances, or to what extent, this could happen. (Doc. 42-1 at 6). His entire support for the proposition that "a dragging or rubbing of a safety along the guide rail would stop or slow down the elevator" is as follows:

> That is just general physics. That is just logic. That is like applying the brake to your car, it is resistance. The more it is dragging, the more resistance you have, the more the unit is going to slow down.

(Doc. 30-7 at 8-9).

That's it. From the unobjectionable observation that the rubbing of one object against another creates friction and resistance to motion, Olson leaps directly to the conclusion that the rubbing of a particular safety along a particular guiderail under particular conditions generated so much friction/resistance that it suddenly (not gradually) and dramatically (not incrementally) decelerated a car that was moving almost six feet per second,[2] and that it did so without causing the safety to engage and bring the car to a complete stop. Olson does not identify, much less employ, any formula, principle, or other scientific methodology to calculate either how much friction/resistance could or would have been generated by the hypothesized rubbing of the safety on the guiderail or how much friction/resistance would have been required to suddenly and dramatically decelerate the elevator. Nor does he explain how a wedge-style safety,

---

[2] (Doc. 30-5 at 3; Doc. 37-7 at 2).

which is designed to literally wedge between guiderail and car so as to physically prevent the car from descending, could generate enough friction/resistance to almost stop the car without becoming wedged and completely stopping it. His entire reasoning is that, because friction exists, friction caused the subject deceleration. This is a patently unreliable basis for his opinion that the rapid deceleration of the elevator was caused by a safety rubbing along the guiderail.

Olson takes a general principle ("general physics," to use his term) and attempts to extrapolate it to a particular situation with no support other than his say-so (which is all that a vague appeal to "logic" amounts to). This will not do. "Although experts commonly extrapolate from existing data[,] nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Hendrix ex rel. G.P. v. Evenflo Co*, 609 F.3d 1183, 1194 (11th Cir. 2010 (internal quotes omitted). When an expert's opinion is "connected to existing data only by the *ipse dixit* of the expert, … the judge is free to conclude that there is simply too great an analytical gap between the data and the opinion offered." *Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014) (internal quotes omitted); *accord McClain v. Metabolife International, Inc*., 401 F.3d 1233, 1255 (11th Cir. 2005). The Eleventh Circuit has been uniformly unsympathetic to opinions as untethered to scientific scrutiny as is Olson's. For example, an appeal to "medical logic," unsupported by experience, testing, publication, or peer review, amounted to "[a] mere guess." *McDowell*, 392 F.3d at 1300-01. Likewise, the "facile transposition of temperature data from one site to another … based on … conjecture [as to similarity] and rough approximation lacks the intellectual rigor required by *Daubert*." *Rink*, 400 F.3d at 1292 (internal quotes omitted). And when an expert relied on "general principles of psychology" without supporting tests or studies, his opinion that a warning must evoke emotion in order to be effective was properly excluded. *Lockman v. S.R. Smith, LLC*, 405 Fed. Appx. 471, 473 (11th Cir. 2010). Other appellate courts view the matter similarly. *See, e.g., ProService Automotive, L.L.C. v. Lenan Corp*., 469 F.3d 1210, 1215 (8th Cir. 2006) (where an expert "provided no testing

7

or mathematical analysis to quantify, even as a rough estimate, how much heat would be transferred through these processes and how it would compare to the heat necessary to ignite combustibles," and instead "offered only vague theorizing based upon general principles," his opinions were properly excluded).

Applying the governing principles, the Court easily concludes that Olson's methodology is insufficiently reliable to support the admission of his opinion that the safety at issue, by dragging along the guiderail, suddenly and dramatically slowed the #2 elevator, causing the plaintiff's fall and injury. Thus, the defendant's motion to exclude Olson's opinions is due to be granted.

As the plaintiff acknowledges, (Doc. 38 at 3), her claims of negligent inspection and maintenance of an elevator, brought against a non-landowner elevator company, are governed by general principles of negligence. *Shanklin v. New Pilgrim Towers, L.P.*, 58 So. 3d 1251, 1256 (Ala. Civ. App. 2010). "To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015) (internal quotes omitted). Whether or not the plaintiff could establish that the defendant breached a duty owed her, without Olson's testimony she cannot establish that any such breach proximately caused the #2 elevator to rapidly decelerate and thereby injure her. Because the plaintiff cannot establish an essential element of the only claims as to which she has not consented to dismissal, the defendant's motion for summary judgment is due to be granted.

## CONCLUSION

For the reasons set forth above, the defendant's motion to exclude is **granted**, and Olson's opinion that the elevator's rapid deceleration was caused by a malfunctioning safety rubbing along the guiderail is **excluded** from evidence. For the reasons set forth

above, the defendant's motion for summary judgment is **granted**.³  Judgment shall be entered accordingly by separate order.

DONE and ORDERED this 19th day of December, 2022.

s/ WILLIAM H. STEELE<br>
UNITED STATES DISTRICT JUDGE

---

³ The plaintiff's motion for partial summary judgment is **denied as moot**.